RENDERED: DECEMBER 13, 2018
TO BE PUBLISHED

**Supreme Court of Kentucky**

FINAL

2017-SC-000528-MR

DATE 1/3/19 Kim Redmon, DC

RICKY L. WELCH            APPELLANT

V.           
ON APPEAL FROM CARROLL CIRCUIT COURT
HONORABLE REBECCA LESLIE KNIGHT, JUDGE
NO. 16-CR-00042

COMMONWEALTH OF KENTUCKY            APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**AFFIRMING**

Following a jury trial in Carroll Circuit Court, Ricky Welch was convicted of first-degree robbery, kidnapping, third-degree burglary and of being a first-degree persistent felony offender ("PFO1"). He was sentenced to fifty years' imprisonment. Welch appeals as a matter of right[1] and raises four claims of error: (1) the trial court abused its discretion by excluding Welch's eyewitness expert testimony, (2) the trial court should have prevented law enforcement officers from presenting expert testimony regarding boot prints and infrared cameras, (3) the photo pack shown to the victim was unduly suggestive due to law enforcement's failure to follow recommended procedures from the

---

[1] Ky. Const. § 110(2)(b).

Department of Justice, and (4) cumulative error warrants reversal. Finding none of Welch's claims meritorious, we affirm.

## I. **FACTUAL AND PROCEDURAL BACKGROUND.**

On February 10, 2016, Judy Jones, the owner of Country Treasures in Carrollton, Kentucky was delivering breakfast to her friend, J.D. Arnold, at his home. Jones arrived at Arnold's home around 9:45 a.m. after a fresh layer of snow had fallen on the ground. As Jones was leaving around 10:00 a.m., she saw a man approaching her from Arnold's barn. The man pointed a gun at her and told her she was being robbed. The man, who was carrying a small black gun, told Jones to get in the car and drive. The man wore a hooded sweatshirt that covered part of his face, but she could tell his skin was "red as fire." Once they were both in the car the man told Jones to "give me your f****** money or I'm going to kill you." Jones gave the man all the money she had, about $500 and a couple checks.

Once she started driving, Jones began to cry. The man told her shut up or he would kill her. Around this time, Jones figured out that the man was Ricky Lee Welch. Jones knew Welch because he was her sole employee's nephew. Jones knew that her employee had raised Welch and Welch had been in the store on five or six different occasions.

Jones followed Welch's directions and steered the car to the back of Butler State Park. There, Welch told Jones to let him out, drive away, and not call police, because he knew where she lived, and he would come back and kill her. Jones had to get out of the car to let Welch out because the child locks

2

were on in the back. When Welch exited the car, he ran into the state park. Jones called a friend soon after Welch disappeared, and that friend called police. When Jones initially talked to police she gave a brief description of her assailant, including that he was wearing dark pants and a dark hooded sweatshirt. She did not tell them that she knew the man was Welch because the woman who raised him was a close friend, and she was still afraid that he would kill her if she told.

Jones gave police a brief description of the robber and told them that Arnold had an infrared trail camera in his barn. Assistant Chief of Police Tim Mitchell was dispatched to the entrance of the state park, and he found a set of bootprints which he followed to the Stack Tite Factory parking lot. Deputy Rodney Hawkins received the SD card from the camera around noon the same day. Deputy Hawkins reviewed the images and recognized Welch from one of the images. Deputy Hawkins then met with Assistant Chief Mitchell and Officer Tim Gividen in the Stack Tite Factory parking lot. Both Mitchell and Gividen also recognized Welch. Officer Gividen knew Welch was staying at a location close to the factory. Upon arrival at Welch's place of residence, Deputy Hawkins saw bootprints in the snow that looked similar to the ones he had seen at Arnold's home.

Upon entry, the officers found Welch standing in the shower, fully clothed. Welch had a pair of wet and muddy black sweat pants draped over his shoulder. Officers discovered Welch's wallet hidden in between some towels with $248 inside. A dark hooded sweatshirt was also discovered in the

3

laundry. Officers did not find a weapon, but Welch's grandmother stated that he did have a black gun that she had not seen in a few days. Welch's grandmother also gave Welch an alibi, testifying that Welch had left the home around 6:00 a.m. and returned home around 9:45 a.m., before the robbery.

Welch was transported to the Carroll County Sheriff's Department, where a computer program created a photo lineup that included a picture of Welch and five other white men with similar features against the same background. Jones came down to the station, was shown the photo lineup, and immediately identified Welch as the person who robbed her. She was also asked to listen to a voice from an adjacent room and identified the voice as the robber. Welch, the man in adjacent room, was subsequently arrested and indicted on charges of first-degree robbery, kidnapping, third-degree burglary, and PFO1.

At trial, Welch sought to introduce the testimony of eyewitness testimony expert, Dr. Jeffrey Neuschatz. For reasons discussed below, Dr. Neuschatz was not allowed to testify at trial, but was allowed to testify by avowal. Upon conclusion of trial, a jury convicted Welch of all charges and the trial court sentenced him to fifty years' imprisonment. This appeal followed.

## II. STANDARD OF REVIEW.

All of Welch's claims of error were preserved for appellate review. Moreover, they are all evidentiary issues. We review the trial court's factual findings for clear error. *Duncan v. Commonwealth*, 322 S.W.3d 81, 95 (Ky. 2010). Further, "[t]he standard of review of an evidentiary ruling is abuse of discretion. The test for abuse of discretion is whether the trial judge's decision

4

was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018) (citations omitted).

## III. ANALYSIS.

### A. Eyewitness Testimony Expert.

Welch attempted to introduce the expert testimony of Dr. Neuschatz, a psychologist from the University of Alabama, Huntsville, who, according to his avowal testimony, has been qualified as an expert in eyewitness testimony in numerous states, including the Commonwealth. The trial court held that Dr. Neuschatz was an expert, but prohibited his testimony, citing *Commonwealth v. Christie*, 98 S.W.3d 485 (Ky. 2002). In *Christie*, this Court held that "trial courts in the Commonwealth have the discretion under KRE[2] 702 to admit expert-witness testimony regarding the reliability of eyewitness identification[.]" *Id.* at 488. The *Christie* court opined (1) that an abuse of discretion occurred when the trial court did not hold a hearing regarding the expert testimony, (2) that the avowal testimony of the witness qualified as expert testimony, and (3) other evidence in the case was weak, thus making exclusion under KRE 403 an abuse of discretion as well. *Id.* at 490–92. The trial court in the present case did not exclude Dr. Neuschatz's testimony based on him not being an expert, but distinguished Welch's facts from those in *Christie*, and held that the present facts allowed it discretion to bar the proffered eyewitness testimony expert.

---

[2] Kentucky Rules of Evidence.

The trial court prohibited the introduction of the evidence because the facts of Welch's case were distinguishable from those in *Christie*. Namely, (1) this was not cross-racial eyewitness testimony, (2) the crime took place over the course of at least fifteen minutes, whereas the robbery in *Christie* was a mere ten second incident, (3) Welch was not a complete stranger to Jones, (4) three officers, some of whom knew Welch very well, identified him from the trail camera image, (5) Jones identified Welch immediately from the photo pack roughly three hours after the incident, and (6) Jones had no sustained or prolonged interview with police officers.

KRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Citing one commentator favorably, the *Christie* court held:

> Where identification rests on testimony by someone who knew the defendant well and was in a good position to see the crime, or where the identification seems strongly established for other reasons (like physical evidence connecting defendant to the crime), there is little reason to admit [eyewitness identification expert] testimony. Where identity is a crucial and closely contested issue, however, and where critical testimony is given by people who did not know the perpetrator and had only a short time to see him or were limited or distracted by other factors, expert testimony seems more clearly warranted.

98 S.W.3d at 491 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence*, § 6.37, at 601 (1995)).

To clarify, "[a] guiding principle, [in admitting eyewitness identification expert testimony,] should be the strength or weakness of the evidence

6

corroborating the eyewitness' positive identification of a defendant." *Shegog v. Commonwealth*, 275 S.W.3d 728, 731 (Ky. App. 2008). Whereas a brief, cross-racial, eyewitness identification was the only strong evidence in *Christie*, the present facts warrant a different conclusion. Not only did the trial court list six separate pieces of evidence distinguishing this case from *Christie*, but several other pieces of evidence existed, including the multitude of bootprints found by officers and their similarity to boots located on Welch's person; Jones's voice identification of Welch at the sheriff's department; and the circumstances surrounding Welch's arrest—fully clothed, in the shower, with dark wet sweatpants draped over shoulder, a dark hooded sweatshirt in the laundry, a large amount of cash in his wallet, and his black gun missing. In contrast to *Christie*, the evidence was not weak, and therefore, the trial court did not abuse its discretion in excluding the expert testimony of Dr. Neuschatz.

## B. Bootprint and Trail Camera Testimony.

Welch next asserts that the trial court abused its discretion by allowing law enforcement officers to effectively testify as experts regarding (1) the comparison of bootprints found at several locations to Welch's boots, and (2) the effects heat has on images taken by a trail camera.

### 1. Bootprint Testimony.

At trial, several officers testified that bootprints found near several locations connecting them to the crime were "consistent" with the boots worn by Ricky Welch when he was arrested. The officers' testimony was based on their observation of the boots and of the bootprints they followed on snowy

7

ground the day of the crime. Images were taken of the bootprints, and along with the boots, were sent into the state lab for analysis. The official lab report, which was entered by the defense, stated that Welch's boots "could neither be identified nor eliminated as having been used to make the suspect footwear impressions depicted in image files . . . due to insufficient detail and lack of scale." Welch urges us to hold that the trial court should not have allowed officers to testify to their observations regarding the consistency between the bootprints and the boots because the official lab report makes no such connection.

> KRE 701 states:
>
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (a) Rationally based on the perception of the witness;
> (b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and
> (c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

This Court has held that KRE 701 is "more inclusionary than exclusionary when the lay witness's opinion is rationally based on the perception of the witness and is helpful to the jury or trial court for a clear understanding of the witness's testimony or the determination of a factual issue." *Hampton v. Commonwealth*, 133 S.W.3d 438, 440–41 (Ky. 2004) (citation omitted). The boot print testimony given by officers was clearly based on their perceptions and it assisted the jury in understanding law enforcement's investigation and the actual observations of individuals who could see detail and scale in person,

8

instead of through photographs. *See D'Antignac v. State*, 233 S.E.2d 206, 207 (Ga. 1977) (no error in officer giving lay opinion testimony comparing defendant's tennis shoe and footprints found at crime scene). Accordingly, no error occurred when officers testified to their observations regarding the bootprints.

2. Trail Camera Testimony.

At trial, the Commonwealth introduced images taken from an infrared "trail camera" that was located in Arnold's barn. The man who installed the camera, Wayne Heightchew, testified to setting up the camera and to delivering its SD card to Deputy Hawkins on the morning of the robbery. Deputy Hawkins testified about his observations from the images and his experiences using trail cameras while hunting. Defense counsel objected to Hawkins' testimony as being beyond the purview of lay testimony. On appeal, Welch argues that Deputy Hawkins' testimony went beyond his own observations and drifted into expert testimony when he began to discuss how the camera worked, and why some images showed the perpetrator as an all-white figure.

On direct examination, Deputy Hawkins testified that the images of the perpetrator were black and white due to the darkness outside. He further stated that he could not tell what color the perpetrator's clothes were because temperature affects the infrared image, making the image mostly white. He stated that this was similar to deer and rabbits he had seen show up as all-white outlines on trail cameras. On cross-examination, defense counsel asked many questions regarding how trail cameras worked at night. Deputy Hawkins

9

reiterated that he was not an expert but tried to explain that the infrared technology picks up on the heat of an object and turns it into an image which could affect what the image looks like, *i.e.,* turn an image white.

Generally speaking, "[s]peculation by a lay witness is not helpful to the jury." *Mondie v. Commonwealth,* 158 S.W.3d 203, 212 (Ky. 2005) (citation omitted). However, "[a] nonexpert witness may express an opinion which is rationally based on the perception of the witness and helpful to a determination of a fact in issue." *Clifford v. Commonwealth,* 7 S.W.3d 371, 374 (Ky. 1999). Reviewed in context, Deputy Hawkins testified almost exclusively on what he observed from the image and compared it to what he had seen on other images taken on trail cameras at night. His testimony was presented to the jury to show that a reason existed as to why Welch's image appeared white in the trail camera images.

Only upon cross-examination did Deputy Hawkins describe in more detail the way he thought infrared trail cameras worked at night. While the questioning by defense counsel certainly delved into areas only an expert should testify to, the obligation is on defense counsel to not ask questions regarding the more sophisticated ways in which a camera works. The same would be said if defense counsel questioned a witness on the way the flash on an iPhone camera works every time an iPhone image was introduced into evidence.

Furthermore, defense counsel argued with Deputy Hawkins as to what is reasonable in a nighttime infrared image, essentially trying to give her own

10

opinion as to how the cameras work. The only reason Deputy Hawkins gave a somewhat detailed explanation on how trail cameras work is because defense counsel essentially backed him into a corner where he had to explain why her "reasonable" assumption that the sweatshirt was light colored was potentially incorrect. Undoubtably, the strategy of defense counsel was to show that Deputy Hawkins' observations could have been flawed due to his lack of scientific expertise regarding the cameras. That is a valid cross-examination technique, but it does not give rise to any error on appeal, as the statements were intentionally drawn out by defense counsel. Accordingly, no abuse of discretion occurred when the trial court did not, *sua sponte*, prohibit defense counsel's inquiries into the technology behind the trail camera, a device commonly used by sportsmen and sportswomen across the Commonwealth.

Additionally, the main evidence introduced through these images was the identification of Welch by Deputy Hawkins, Assistant Chief Mitchell and Officer Gividen, as to which Welch does not now assign error. These identifications were certainly based on the observations of the officers, and if any error occurred during the testimony of Deputy Hawkins regarding the technicalities of trail cameras, the error was harmless under RCr[3] 9.24 as "we can say with fair assurance that the judgment was not substantially swayed by the error." *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010).

---

[3] Kentucky Rules of Criminal Procedure.

11

## C. Photo Array Identification Evidence.

Welch next claims that the trial court abused its discretion when it did not exclude the photo identification of Welch by Jones. Welch argues on appeal that the photo identification was inadmissible because law enforcement officers did not follow a 1999 Department of Justice guideline discussed by Dr. Neuschatz during his avowal testimony. However, at trial, Welch's argument was that the photo ID process used by law enforcement was "unduly suggestive" for a different reason—that the victim did not see the face of the perpetrator during the fifteen minutes the crime occurred and that the photo array was unduly suggestive. We find that neither argument amounts to error.

Welch cites to no authority in making his argument that Kentucky law enforcement officers must follow procedures from a 1999 Department of Justice guideline. Therefore, we disagree with his argument that the failure to follow such procedures amounted to error. Furthermore, the procedures law enforcement used in getting the photo identification were not "unduly suggestive."

In the Commonwealth, whether an identification violates the due process rights of a defendant is a two-step process. First, we determine whether the "identification procedures were 'impermissibly suggestive.'" *Duncan v. Commonwealth*, 322 S.W.3d 81, 95 (Ky. 2010) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968)). If the procedures were not impermissibly suggestive no due process violation

occurred, the inquiry ends, and no error exists. If "the procedures were unduly suggestive . . . [we] determine[] whether, in light of the totality of the circumstances, the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971).

Neither Jones's identification nor the photo array were unduly suggestive. Jones gave a legitimate reason as to why she did not identify Welch as the assailant upon initial contact with police. Deputy Hawkins identified the individual from the trail camera image as Welch. Welch was brought to the sheriff's office and placed in a room. When Jones arrived at the station she did not see Welch. A computer program generated a photo array of five individuals besides Welch, all having similar characteristics to Welch and photographed upon the same background. Jones immediately identified Welch. Accordingly, no error occurred.

## IV. CONCLUSION.

For the foregoing reasons, this Court finds no error in the issues presented to us. As a result, Welch's claim that cumulative error warrants reversal also lacks merit. The judgment of the circuit court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert Chung-Hua Yang
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General